UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
A.K.,

                                Plaintiff,

         -against-

ANTHONY J. ANNUCCI, CLIFFORD A. ROWE,
JEFFREY BOWERS, MATTHEW LATHAM,
SUPERINTENDENT BRANDON SMITH,
SUPERINTENDENT LYNN J. LILLEY, DEPUTY
SUPERINTENDENT OF SECURITY TIMOTHY
HUMPHREY, DEPUTY SUPERINTENDENT OF
SECURITY THOMAS MCGUINNESS, "JOHN"
LOCKHART, "JOHN" DIPAOLO, and "JOHN DOES
1-25", fictitious names used to identify presently unknown
individuals,

                               Defendants.
-------------------------------------------------------------------X

17 Civ. 769 (VB)

**AMENDED VERIFIED
COMPLAINT**

<u>Jury Trial Demanded</u>

      Plaintiff, A.K., by her attorneys, HELD & HINES, LLP, as and for her Amended

Verified Complaint, hereinafter states and alleges as follows upon information and belief:

<u>**PRELIMINARY STATEMENT**</u>

      1.    At all times alleged herein, Plaintiff was a transgender prisoner undergoing

gender transitioning (male to female)[1] and confined to the custody and care of the New York

State Department of Corrections and Community Supervision ("DOCCS") at its Greene and

Woodbourne Correctional Facilities. There, A.K. was repeatedly subjected to cruel, inhumane

and dehumanizing brutality by way of repeated rapes[2], sexual assaults and abuses, and abusive

---

[1] Plaintiff uses the "she" and "her" pronouns herein.
[2] The term "rape" will be used in this Complaint to refer to the sexual assaults that Plaintiff suffered. The Prison
Rape Elimination Act ("PREA") defines rape as "the carnal knowledge, oral sodomy, sexual assault with an object,
or sexual fondling of a person, forcibly or against that person's will." Prison Rape Elimination Act of 2003, PL No.

pat frisks.

2.      New York State has recognized the coercive power correction officers wield over incarcerated individuals, and the related risk of rape and other sexual abuse, by criminalizing all sexual activity between incarcerated individuals and correctional staff in New York Penal Law §130.05(3)(f), New York Penal Law §130.25(1), and New York Penal Law §130.40(1). The DOCCS Commissioner, superintendents, and deputy superintendents of Greene Correctional Facility and Woodbourne Correctional Facility were aware that New York State has identified a significant risk of sexual coercion of individuals in custody, but they nonetheless permitted a culture of systemic sexual victimization by officers against prisoners to exist in their facilities.

3.      Through internal studies, statistics, and reports, as well as published studies, statistics, and reports, the DOCCS Commissioner, superintendents, and deputy superintendents of Greene Correctional Facility and Woodbourne Correctional Facility (hereinafter "the defendant supervisory officials") were aware that transgender prisoners are sexually victimized at rates nearly ten times of other incarcerated people. Similarly, they are aware of U.S. Bureau of Justice Statistics finding that nearly 40% of all transgender prisoners reported sexual assault and abuse, with transgender women housed in male prisons at the greatest risk and nearly half of these incidents of sexual violence being committed by facility staff. Despite this, the defendant supervisory officials permitted a culture of systemic sexual victimization by officers against prisoners to exist in their facilities.

4.      Through internal studies, statistics, and reports, as well as published studies,

---

108-79, 117 Stat 972. The federal government has similarly expanded its definition of rape in compiling crime statistics. Its updated definition includes forcible oral or anal penetration of a person of any gender. FBI, *VCR Program Changes Definition of Rape: Includes All Victims and Omits Requirement of Physical Force,* (Mar. 2012) http://www.fbi.gov/about-us/cjis/cjis-link/march-2012/ucrprogram-changes-definition-of-rape.

statistics, and reports, the defendant supervisory officials were aware that victims of sexual abuse and harassment in one prison are at a heightened risk of sexual abuse and harassment upon transfer to another prison. Despite this, the defendant supervisory officials permitted a culture of systemic sexual victimization by officers against prisoners to exist in their facilities.

5.      Beginning in February 2014, Plaintiff was sexually victimized, including being raped, by defendant Clifford Rowe, a correction officer at Greene Correctional Facility ("Greene CF"), on numerous occasions. Plaintiff was sexually victimized by Rowe until such time that he was arrested by the New York State Police on or about September 3, 2014.

6.      Between February 2014 and September 2014, Plaintiff was sexually victimized by defendant Matthew Latham, a correction officer at Greene CF, on numerous occasions. Defendant Latham performed gratuitous pat frisks on Plaintiff during which time he fondled Plaintiff's breasts, buttocks and penis in a sexual manner and made sexual comments about Plaintiff's breasts and penis size. Defendant Latham also used intimidation tactics to reinforce his authority and prevent Plaintiff from reporting the abuse, including but not limited to instructing certain inmates to attack Plaintiff, opening Plaintiff's legal mail and reading it aloud to other inmates, and reading Plaintiff's medical records aloud to other inmates.

7.      After being transferred to Woodbourne Correctional Facility ("Woodbourne CF") in or about September 2014, Plaintiff was sexually victimized by defendant Jeffrey Bowers, a correction sergeant. On numerous occasions between late 2014 and mid-2016, defendant Bowers raped Plaintiff, orally and anally. On several other occasions, defendant Bowers visited Plaintiff's cell and told her to take off her clothes. Other times, defendant Bowers would grope and touch Plaintiff in a sexual manner. There was no legitimate reason for defendant Bowers to

make Plaintiff remove her clothing or for defendant Bowers to place his hands on Plaintiff's genitalia at the times these incidents occurred. Rather, this was done solely for defendant Bowers' own sexual gratification. In fact, on more than one occasion when defendant Bowers told Plaintiff to remove her clothing, he also instructed Plaintiff to get an erection and masturbate herself while Bowers rubbed Plaintiff's breasts and inserted his finger in Plaintiff's anus.

8.      The pervasive culture of rape and other sexual abuse described herein is common knowledge among the defendant supervisory officials of the DOCCS system. Additionally, correction officers[3] and clinical staff assigned to these prisons know not only that prisoners are being regularly abused, but also which officers commit the abuses, which prisoners are being abused, and when and where the abuses most often occur. Despite the foregoing, the defendants, acting under color of state law, caused, allowed and/or permitted Plaintiff to be deprived of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. §1983.

## JURISDICTION AND VENUE

9.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4) and because the matters in controversy arise under 42 U.S.C. §1983.

10.     Plaintiff's claim for attorney's fees and costs is predicated upon 42 U.S.C. §1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

11.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(b)(2), as

---

[3] As used herein, the term "correction officer" or "officer" is intended to refer to all DOCCS members of service and not to any specific rank, title or position.

a substantial part of the events or omissions giving rise to this claim occurred within Sullivan County, New York, which lies within the Southern District of New York.

## PARTIES

12.     At all times relevant hereto, Plaintiff A.K. is a transgender woman (transitioning from male to female) and confined to the custody and care of the New York State Department of Corrections and Community Supervision ("DOCCS").

13.     A.K. was incarcerated at Greene CF from late-January 2014 through September 2014.

14.     A.K. was incarcerated at Woodbourne CF from September 2014 through April 2016.

15.     Greene CF is a medium security men's prison situated in Greene County, New York, at 165 Plank Road, Coxsackie, New York.

16.     Woodbourne CF is a medium security men's prison situated in Sullivan County, New York, at 99 Prison Road, Woodbourne, New York.

17.     At all times alleged herein, defendant Anthony J. Annucci ("Commissioner Annucci" or "Annucci"), was and remains the Acting Commissioner of DOCCS, having been appointed by Governor Andrew Cuomo. Commissioner Annucci was and remains the chief executive officer of DOCCS.

18.     As DOCCS Commissioner, Annucci is responsible for the

> superintendence, management and control of the correctional facilities in the department and of the inmates confined therein, and of all matters relating to the government, discipline, [and] policing…concerns thereof. He…[has] the power and it shall be his…duty to inquire into all matters connected with said correctional facilities. He…shall make such rules and regulations, not in conflict with the statutes of this state, for the

> government of the officers and other employees of the department assigned to said facilities, and in regard to the duties to be performed by them, and for the government and discipline of each correctional facility, as he…may deem proper, and shall cause such rules and regulations to be recorded by the superintendent of the facility, and a copy thereof to be furnished to each employee assigned to the facility…He…shall appoint and remove…subordinate officers and other employees of the department who are assigned to correctional facilities."[4]

19.    Commissioner Annucci also has the duty and power to require reports from all DOCCS superintendents and employees, to inquire into any improper conduct alleged to have been committed by any person at any correctional facility,[5] to require psychological screening of all applicants, to bar and remove the appointment of any person to the position of correction officer or supervisor, to develop, implement and enforce policies and practices consistent with the Prison Rape Elimination Act, to require the transfer of prisoners for medical diagnoses and treatment to outside hospitals,[6] to require a background investigation of all applicants, to require a thorough investigation to determine the character and fitness of all applicants, to require all new officers to participate in and satisfactorily complete all requirements of a traineeship program before advancing to Correction Officer, and to require all appointees to serve and satisfactorily complete a probationary period before advancing from Trainee to Correction Officer.

20.    At all times alleged herein, defendant Brandon Smith was the Superintendent of Greene CF, having been appointed by the commissioner of DOCCS. As Superintendent, defendant Smith ("Superintendent Smith" or "Smith") was directly responsible for the

---

[4] New York Correction Law §112(1).
[5] New York Correction Law §112(3).
[6] New York Correction Law §§5-8, 22-a, 23.

supervision and management of Greene CF[7], including but not limited to directing the work of all officers and subordinates at the facility, defining the duties of all officers and subordinates at the facility, implementing and enforcing policies and practices consistent with the Prison Rape Elimination Act, recommending transfer of a prisoner for medical diagnosis and treatment at an outside hospital, enforcing general security policies, and authorizing and managing policies, procedures and customs governing day-to-day security. Additionally, Superintendent Smith was responsible for overseeing the day-to-day operation of Greene CF and was responsible for the assignment and removal of staff, the training of staff, and the supervision of staff and prisoners to ensure a safe and secure environment. Superintendent Smith was also responsible for conducting rounds of the housing areas and reading area logbooks to make sure officers, sergeants and captains were being administered accurately. Superintendent Smith was also responsible for decisions concerning assignment and discipline of staff. Superintendent Smith was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Superintendent Smith was also responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. Superintendent Smith was also responsible for being familiar with each prisoner's file, including letters from family, clergy, attorneys, and advocacy groups which detail the heightened risk plaintiff faced as a transgender prisoner. Superintendent Smith also had a policy or practice of (a) treating transgender prisoners adversely to other inmates, (b) refusing protective custody to

---

[7] New York Correction Law §18, 23.

prisoners who felt threatened by officers, (c) allowing officers to threaten and abuse prisoners in order to avoid grievances and complaints, (d) failing to adjust staffing levels when understaffed, (e) allowing officers to leave their post and roam about the facility, (f) allowing officers to leave areas unguarded and/or unsecured, (g) allowing officers, sergeants, captains, deputies and other supervisory personnel to inconsistently and/or rarely patrol certain areas, often times making inaccurate and/or fraudulent entries in log books and official records indicating rounds that did not occur, (g) failing to faithfully investigate officers, sergeants, captains, deputies and other supervisory personnel who are believed to have left their post, or left an area unsecured or unguarded, or made false entries in log books or official records, and to punish the offenders significantly enough to act as a meaningful deterrent, and (g) failing to faithfully investigate allegations of sexual harassment and/or assault by staff on prisoners. Superintendent Smith was grossly negligent in supervising his subordinates who abused plaintiff.

21.     At all times alleged herein, defendant Lynn J. Lilley was the Superintendent of Woodbourne CF, having been appointed by the commissioner of DOCCS. As Superintendent, defendant Lilley ("Superintendent Lilley" or "Lilley") was directly responsible for the supervision and management of Woodbourne CF[8], including but not limited to directing the work of all officers and subordinates at the facility, defining the duties of all officers and subordinates at the facility, implementing and enforcing policies and practices consistent with the Prison Rape Elimination Act, recommending transfer of a prisoner for medical diagnosis and treatment at an outside hospital, enforcing general security policies, and authorizing and managing policies, procedures and customs governing day-to-day security. Additionally,

---

[8] Id.

Superintendent Lilley was responsible for overseeing the day-to-day operation of Woodbourne CF and was responsible for the assignment and removal of staff, the training of staff, and the supervision of staff and prisoners to ensure a safe and secure environment. Superintendent Lilley was also responsible for conducting rounds of the housing areas and reading area logbooks to make sure officers, sergeants and captains were being administered accurately. Superintendent Lilley was also responsible for decisions concerning assignment and discipline of staff. Superintendent Lilley was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Superintendent Lilley was also responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. Superintendent Lilley was also responsible for being familiar with each prisoner's file, including letters from family, clergy, attorneys, and advocacy groups which detail the heightened risk plaintiff faced as a transgender prisoner. Superintendent Lilley also had a policy or practice of (a) treating transgender prisoners adversely to other inmates, (b) refusing protective custody to prisoners who felt threatened by officers, (c) allowing officers to threaten and abuse prisoners in order to avoid grievances and complaints, (d) failing to adjust staffing levels when understaffed, (e) allowing officers to leave their post and roam about the facility, (f) allowing officers to leave areas unguarded and/or unsecured, (g) allowing officers, sergeants, captains, deputies and other supervisory personnel to inconsistently and/or rarely patrol certain areas, often times making inaccurate and/or fraudulent entries in log books and official records indicating rounds that did not occur, (g) failing to faithfully investigate officers, sergeants,

captains, deputies and other supervisory personnel who are believed to have left their post, or left an area unsecured or unguarded, or made false entries in log books or official records, and to punish the offenders significantly enough to act as a meaningful deterrent, and (g) failing to faithfully investigate allegations of sexual harassment and/or assault by staff on prisoners. Superintendent Lilley was grossly negligent in supervising his subordinates who abused plaintiff.

22.     At all times alleged herein, defendant Timothy Humphrey ("Deputy Humphrey" or "Humphrey") was the Deputy Superintendent for Security at Woodbourne CF and was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Deputy Humphrey was also responsible for conducting rounds of the housing areas and reading area logbooks to make sure officers and sergeants were being administered accurately. Deputy Humphrey was also responsible for decisions concerning assignment and discipline of staff. Deputy Humphrey was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Deputy Humphrey was also responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. Deputy Humphrey was grossly negligent in supervising his subordinates who abused plaintiff.

23.     At all times alleged herein, defendant Thomas McGuinness ("Deputy McGuinness" or "McGuinness") was the Deputy Superintendent for Security at Greene CF and was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Deputy McGuinness was also responsible for

conducting rounds of the housing areas and reading area logbooks to make sure officers and sergeants were being administered accurately. Deputy McGuinness was also responsible for decisions concerning assignment and discipline of staff. Deputy McGuinness was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Deputy McGuinness was also responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. Deputy McGuiness was grossly negligent in supervising his subordinates who abused plaintiff.

24.     Defendant Clifford A. Rowe ("C.O. Rowe" or "Rowe") was, at all times relevant hereto, a correction officer employed by DOCCS and assigned to Greene CF. As such, C.O. Rowe was responsible for the safety and security of the prisoners confined to Greene CF. At all times alleged herein, C.O. Rowe was acting under color of law and is being sued in his individual and official capacities.

25.     Defendant Jeffrey Bowers ("Sgt. Bowers" or "Bowers") was, at all times relevant hereto, a correction sergeant employed by DOCCS and assigned to Woodbourne CF. As such, Sgt. Bowers was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Sgt. Bowers was also responsible for conducting rounds of the housing areas and reading area logbooks to make sure officers were being administered accurately. Sgt. Bowers was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Sgt. Bowers was also

responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. At all times alleged herein, Sgt. Bowers was acting under color of law and is being sued in his individual and official capacities.

26.     Defendant Matthew Latham ("C.O. Latham" or "Latham") was, at all times relevant hereto, a correction officer employed by DOCCS and assigned to Greene CF. As such, C.O. Latham was responsible for the safety and security of the prisoners confined to Greene CF. At all times alleged herein, C.O. Latham was acting under color of law and is being sued in his individual and official capacities.

27.     Defendant "John" DiPaolo ("Sgt. DiPaolo" or "DiPaolo") was, at all times relevant hereto, a correction sergeant employed by DOCCS and assigned to Woodbourne CF. As such, Sgt. DiPaolo was responsible for the supervision of staff and prisoners to ensure a safe environment, including the enforcement of DOCCS rules and regulations. Sgt. DiPaolo was also responsible for conducting rounds of the housing areas and reading area logbooks to make sure officers were being administered accurately. Sgt. DiPaolo was also responsible for making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards, behaving appropriately, and the areas were safe and secure. Sgt. DiPaolo was also responsible for knowing about the history of sexual abuse and harassment of each prisoner, the history of sexual abuse and harassment by each officer, and the location(s) where allegations of sexually abusive behavior occurs. Sgt. DiPaolo was grossly negligent in supervising his subordinates who abused plaintiff. At all times alleged herein, Sgt. DiPaolo was acting under color of law and is being sued in his individual and official capacities.

28.     Defendant "John" Lockhart ("C.O. Lockhart" or "Lockhart") was, at all times relevant hereto, a correction officer employed by DOCCS and assigned to Woodbourne CF. As such, C.O. Lockhart was responsible for the safety and security of the prisoners confined to Woodbourne CF. C.O. Lockhart was also responsible for reporting sexual abuse and harassment to this superiors and taking immediate corrective action. At all times alleged herein, C.O. Lockhart was acting under color of law and is being sued in his individual and official capacities.

29.     Defendants John Does 1-25 ("John Does") are the supervisory officials, correction officers and prison clinical staff who witnessed and/or were aware of the incidents alleged herein and failed to report same; who witnessed and/or were aware of prior similar incidents involving the defendant abusers and failed to report same; who were personally involved in drafting and submitting incomplete, false and/or misleading reports; who failed to intervene and/or protect Plaintiff from the incidents and defendants alleged herein; who failed to report or truthfully report or investigate the incidents alleged herein; who lied to investigators and/or covered up the truth about the incidents alleged herein so as to protect the defendant abusers; who were responsible for supervising the officers and prisoners in their assigned area, making sure that officers followed the rules and regulations and attended to their job duties; who were responsible for conducting rounds of their assigned area(s), reporting unusual conduct and incidents, and reading area log books to make sure that they were being administered accurately; who were responsible for making visual inspections of their assigned area(s) to ensure compliance with rules, standards, safety and security; and who were responsible for the safety and security of Plaintiff when within their assigned area(s). At all times alleged herein, defendants John Does were acting under color of law and are being sued in their individual and

official capacities.

## STATEMENT OF FACTS

30.     At all times relevant hereto, A.K. is a transgender woman, gender transitioning from male to female, confined to DOCCS custody and care since January 2014.

31.     A.K. has presented herself as a woman for as long as she has been in DOCCS custody. Accordingly, the defendant supervisory officials knew or should have known that A.K. was at a heightened risk for sexual violence in a men's prison because of her gender identity.

32.     Additionally, A.K. notified DOCCS that she was sexually victimized while at Rikers Island by an individual of authority, a chaplain, prior to be transferred to DOCCS custody. This information was added to her file. As prior victims of sexual abuse are at heightened risk of further sexual abuse, the defendant supervisory officials were aware that Plaintiff was at a heightened risk for sexual victimization while in DOCCS custody, yet failed to take reasonable measures to improve or increase security for Plaintiff.

33.     Upon information and belief, the defendant supervisory officials have received investigative reports and advocacy letters sent by government agencies and legal organizations that detail the disproportionate risk of sexual violence that transgender female prisoners face in prison. The defendant supervisory officials have also received training that specifically detail the disproportionate risk of sexual violence that transgender female prisoners face in men's prisons.

34.     The defendant supervisory officials have received investigative reports from the Correctional Association of New York, Prison Visiting Project, that detail the disproportionate risk of sexual violence that transgender and female prisoners face in prison.[9]

---

[9] In his April 27, 2011 testimony to the Department of Justice and the Review Panel on Prison Rape, Jack Beck, Director of the Correctional Association of New York's Prison Visiting Project, stated that "Studies show that

35.     The defendant supervisory officials have received statistics, studies and reports that transgender prisoners are sexually victimized at rates nearly ten times of other incarcerated people. Similarly, they are aware of U.S. Bureau of Justice Statistics finding that nearly 40% of all transgender prisoners reported sexual assault and abuse, with transgender women housed in male prisons at the greatest risk, and nearly half of these incidents of sexual violence being committed by facility staff.

36.     The defendant supervisory officials have received reports from the New York State Commission of Correction that detail the disproportionate risks of sexual violence that transgender and female prisoners face in prison.

37.     Advocacy letters sent by legal organizations on behalf of transgender prisoners are maintained by DOCCS in the prisoner's file that is transferred along with the prisoner each time he/she is moved to a different prison.

38.     When A.K. was received into DOCCS custody in January 2014, the defendant supervisory officials were made aware that she is a transgender female. Her file was replete with paperwork related to her transgender identity.

39.     When A.K. arrived at Greene CF in or about late January 2014, Superintendent Smith and Deputy McGuinness were made aware that she is a transgender female with a history of prior sexual abuse. Her file was replete with paperwork related to same, all received in advance of the first instance of sexual victimization at Greene CF.

40.     When A.K. arrived at Woodbourne CF in or about late January 2014,

---

women with abuse histories are highly likely to be targeted for harassment and abuse, are statistically more likely to be re-victimized, and, when targeted, are especially prone to suffer symptoms of Post-Traumatic Stress Disorder. Because of the extraordinary rates of abuse histories among women in prison, women as a whole category are at particular risk of experiencing abuse in prison."

Superintendent Lilley and Deputy Humphrey were made aware that she is a transgender female with a history of prior sexual abuse. Her file was replete with paperwork related to same, all received in advance of the first instance of sexual victimization at Woodbourne CF.

<u>Defendant Clifford Rowe</u>

41.     Between February 2014 and September 2014, Plaintiff was sexually victimized numerous times by defendants Rowe and Latham at Greene CF.

42.     In or about February 2014, defendant C.O. Rowe began to impermissibly give Plaintiff special privileges in order to curry favor from her, including but not limited to bringing salads, pizza and snacks to Plaintiff, permitting her to shower alone after the other prisoners were in bed for the night, and claiming that he was providing her protection from other prisoners.

43.     As set forth above, Superintendent Smith, Deputy McGuinness, and John Does 1-25 were responsible for *inter alia* conducting rounds of the housing areas, reading area logbooks, and making visual inspections of the housing areas to ensure that prisoners and staff were in compliance with rules and standards. These defendants were grossly negligent in their supervision of C.O. Rowe such that he was able to give food contraband and special privileges to Plaintiff for several months without discovery, corrective action or discipline being taken against him.

44.     These defendants' gross negligence is also exhibits by the fact that C.O. Rowe was not Plaintiff's steady housing area officer yet he would find ways and reasons to pick up that specific assignment. On those nights that he would abuse Plaintiff, his routine would be to wait for the "John Doe" watch commander and sergeant to come at their routine time, do their rounds,

and sign the logbook. Once they left, C.O. Rowe knew that no one else would come by until the morning and he would not be caught.

45.     On several occasions when C.O. Rowe allowed Plaintiff to shower alone off hours, he would ogle her while she showered – commenting on her body and making statements that she had "a model's body" and he liked the way her breasts bounced when she walked. On at least one occasion, C.O. Rowe grabbed A.K. by her breasts, buttocks and throat while she showered.

46.     C.O. Rowe told Plaintiff that he had a sexual fetish known as "breath play" and so he would frequently grab her by the throat and make her swallow so that he could feel her throat move. C.O. Rowe was a member of "The Experience Project" website under the name of "Strangler2257." On this public website, members post their experiences and fantasies for others to read. C.O. Rowe posted that he fantasizes about strangling people while having sex with them.

47.     In or about July 2014, C.O. Rowe began waking Plaintiff up in the middle of the night to talk to her about his troubled family life. On one occasion, C.O. Rowe told Plaintiff that he likes young transgender females such as Plaintiff and is looking for a "mistress." C.O. Rowe then ordered Plaintiff to go to the bathroom, where he began groping Plaintiff and then pulled out his penis and ordered Plaintiff to give him oral sex, which she did.

48.     A few weeks later, C.O. Rowe again woke Plaintiff up in the middle of the night, this time to bring Plaintiff into the officers' office (an area inmates are restricted from entering). There, C.O. Rowe raped Plaintiff orally and anally. C.O. Rowe also placed his hands around Plaintiff's throat and used "breath play" techniques, which nearly caused Plaintiff to lose consciousness.

49.     On September 3, 2014, C.O. Rowe again woke Plaintiff up in the middle of the night for sex. This time, with a hard smack to her face and then dragged her out of bed and forced her into the officer's office. There, Rowe ordered Plaintiff to sit in the chair and he then pulled out his penis and ordered Plaintiff to give him oral sex, which she did. Rowe also choked Plaintiff as part of his "breath play" fetish. Rowe then ordered Plaintiff to insert her fingers in her anus while he watched, which she did. Rowe then inserted his own fingers in Plaintiff's anus several times. Rowe ejaculated into Plaintiff's mouth and ordered her to swallow his semen. Rowe then grabbed Plaintiff by the face, threatened her to never speak about what happened, and then released her from the officers' office back to her cube.

50.     Upon returning to her cube, Plaintiff spit Rowe's semen into a pill bottle and secured it in her locker.

51.     Later that day, a prisoner who saw Plaintiff leaving the officers' office with Rowe reported the incident to a DOCCS counselor. Plaintiff was later taken to the hospital, where a rape kit was performed and she was interviewed by state investigators. The pill bottle with Rowe's semen was given to investigators. DNA collected from the pill bottle and Plaintiff's person was eventually matched to C.O. Rowe.

52.     On September 3, 2014, C.O. Rowe was arrested by the New York State Police, working with state investigators, and charged with violations of N.Y.P.L. §130.40 ("Criminal Sex Act in the third degree," an E felony), §130.60 ("Sexual abuse in the second degree," an A misdemeanor), and §195.00 ("Official misconduct," an A misdemeanor).

53.     On September 5, 2014, C.O. Rowe was questioned under oath by DOCCS' Inspector General's Office as part of its official investigation into the September 3, 2014

incident. During the course of his testimony, C.O. Rowe testified:

      a.   That although he was given an employee's manual when he was hired, he did not really read it;

      b.   That although the officers' bathroom and officers' office (the two areas he took Plaintiff to sexually abuse her) are required to be secured, it was his practice not to secure it. When asked why he did not secure those rooms, C.O. Rowe responded, "No reason, sir.";

      c.   That although the officers' bathroom and officers' office are required to be secured, he would sometimes come on shift and they were not secured by the outgoing officer;

      d.   That he masturbates four to six times (at most eight times) per month while on duty – each time during the 11:00 p.m. to 7:00 a.m. tour;

      e.   That he gets the urge to masturbate in the middle of the night and so he goes to the officers' bathroom to do so; and

      f.   That he has been masturbating at work for over a year.

54. On or about August 8, 2016, C.O. Rowe pleaded guilty to the criminal charge of official misconduct.

55. Prior to the September 3, 2014, there were several occasions where prisoners caught C.O. Rowe and Plaintiff together in an area they should not have been in. At least twice, they were seen in the inmate's bathroom together, with both of them in the same stall with their pants pulled down to their ankles. Another time, C.O. Rowe was seen walking Plaintiff out of the laundry room at about 3:45 a.m.; C.O. Rowe was not wearing any shoes.

Defendant Matthew Latham

56.     Between February 2014 and September 2014, Plaintiff was also being physically and sexually victimized by defendant C.O. Latham at Greene CF.

57.     On or about February 15, 2014, C.O. Latham performed a gratuitous pat frisk on Plaintiff, during which time he fondled Plaintiff's breasts and asked her if she was a "faggot." When Plaintiff did not respond, C.O. Latham kicked her in the back of her legs and struck her in the back of her head.

58.     Between February and April 2014, C.O. Latham repeatedly denied Plaintiff her prescribed estrogen pills and refused to let her leave the dorm in order to obtain it. On or about April 21, 2014, C.O. Latham told Plaintiff that he will "fuck [her] up" if she asked to go for her medication again and then called her a racial epithet.

59.     Plaintiff feared C.O. Latham. Plaintiff was not the only prisoner in fear of C.O. Latham as he was physically abusive to most prisoners. It was common knowledge amongst prisoners that if C.O. Latham did not like a prisoner he would orchestrate that prisoner being beaten by another prisoner, or would randomly throw a prisoner against the wall, or would throw the prisoner's food to the ground, or would open the prisoner's locker and start giving away his things. C.O. Latham routinely told prisoners that he would not think twice before killing them.

60.     Upon information and belief, numerous prisoners filed numerous grievances about C.O. Latham's abusive behavior. Upon information and belief, numerous prisoners filed lawsuits against *inter alia* C.O. Latham related to incidents of physical and sexual abuse. One such individual had his genitals stomped on by C.O. Latham and was injured so badly that he can no longer have children. Another was taken out of the dorm by C.O. Latham and forced to stand

in the snow in his shirt and boxers, and was then thrown against a wall head first. Another was

punched by C.O. Latham over a form.

61.     Because of C.O. Latham's statements to Plaintiff and reputation amongst

prisoners, Plaintiff legitimately feared reprisal from C.O. Latham in the event she reported these

incidents. Nevertheless, Plaintiff did report to "John Doe" school sergeant that she felt threatened

and sexually harassed by C.O. Latham. "John Doe" school sergeant told Plaintiff that she could

not be moved to protective custody merely because she felt threatened by an officer. "John Doe"

school sergeant took no action to notify his direct superiors or other supervisory personnel or

document the plaintiff's complaints of sexual victimization by C.O. Latham.

62.     A week or so later, C.O. Latham retaliated against Plaintiff for speaking to "John

Doe" school sergeant. In an effort to humiliate her and silence her from making any further

complaints, on or about June 6, 2014, C.O. Latham took Plaintiff's legal mail and read it aloud to

other inmates. This mail concerned a prior sexual assault by a chaplain at Rikers Island and

referenced her allegations and medical treatment. In addition to violating Plaintiff's rights and

embarrassing her, this also placed Plaintiff in imminent harm as prisoners later attempted to

extort money from her.

63.     On or about July 1, 2014, C.O. Latham grabbed Plaintiff by the throat and choked

her.

64.     On another occasion, C.O. Latham told Plaintiff to put her hands on the wall for a

pat frisk, which she did. Latham then started to pull Plaintiff's hair, choking her, and punching

her in the face and ribs.

65.     C.O. Latham would frequently pat frisk Plaintiff in the vestibule when she was

alone. Latham would use the guise of those pat frisks to fondle Plaintiff's breasts, buttocks and groin in a sexual manner. While groping Plaintiff, C.O. Latham would make sexual comments about Plaintiff's breasts (saying they felt soft and "real") and penis size.

66.     Defendant Latham used intimidation tactics to reinforce his authority and prevent Plaintiff and others from reporting the physical and sexual abuse, including but not limited to instructing certain inmates to attack Plaintiff, random beatings by officers, opening Plaintiff's legal mail and reading it aloud to other inmates, and reading Plaintiff's medical records aloud to other inmates.

67.     C.O. Latham and Rowe's brazen and abusive behavior was allowed to occur and continue by virtue of the gross negligence in which they and the subject housing areas were supervised. By making predictable rounds, failing to ensure secured areas were actually secured, and otherwise failing to supervise their subordinates as set forth herein, in violation of their supervisory responsibilities, defendants Smith, McGuinness, and "John Doe" sergeants, captains, watch commanders, and deputies were grossly negligent in the instance. Likewise, these defendants were aware of the serious risk of sexual assault that Plaintiff faced and failed to remediate that risk. These defendants did not address Plaintiff's safety nor properly assess the danger she was in. These defendants knew that the housing area was understaffed, unmonitored, and isolated because they conducted rounds of the area, read the area logbooks, and made visual inspections. It is reasonable to believe or infer that these defendants knew about Latham and Rowe's ongoing sexual abuse and harassment of Plaintiff. These defendants also created policies, customs and practices that allowed the unconstitutional acts to occur, including but not limited to the routine lack of adequate supervision in the areas where Plaintiff was sexually

harassed and abused, the handling of day-to-day security that allowed Latham and Rowe to be alone with Plaintiff for extended periods of time, and in making routine rounds that allowed Latham and Rowe to know when it was safe to harass and abuse Plaintiff.

Defendant Jeffrey Bowers

68.     After being transferred to Woodbourne Correctional Facility in or about September 2014, Sgt. Bowers began to sexually victimize Plaintiff.

69.     Sgt. Bowers and defendants John Doe officers made it clear to Plaintiff that they knew what transpired between Rowe and Plaintiff at Greene CF and disliked her because of it.

70.     The John Doe officers at Woodbourne CF retaliated against Plaintiff by issuing fraudulent misbehavior reports against her. In exchange for sexual favors, Sgt. Bowers would try, often successfully, to get Plaintiff out of disciplinary action.

71.     Between late 2014 and mid-2016, Sgt. Bowers raped Plaintiff, orally and anally, numerous times.

72.     Between late 2014 and mid-2016, Sgt. Bowers groped and touched Plaintiff in a sexual manner numerous times.

73.     Between late 2014 and mid-2016, Sgt. Bowers frequently came to Plaintiff's cell and ordered her to remove her clothing, which she did. Sgt. Bowers would then order Plaintiff to get an erection and masturbate herself, which she did. Bowers would watch Plaintiff masturbate herself.

74.     On one occasion, Sgt. Bowers came to Plaintiff's cell after lock-in and told Plaintiff to remove her clothes and masturbate herself, which she did. Sgt. Bowers then told Plaintiff to perform oral sex on him, which she did.

75.     A prisoner found out about this incident and reported same to the Inspector General's Office.

76.     It quickly became clear to Plaintiff that prisoners were aware about this incident, as were officers. Approximately one or two weeks after this incident, defendant C.O. Lockhart informally asked Plaintiff questions about what was going on between her and Sgt. Bowers and why Sgt. Bowers was always in front of her cell. C.O. Lockhart did not report Sgt. Bowers' abuse of Plaintiff to his superiors or other supervisory personnel as required by law.

77.     Defendant Sgt. DiPaolo was also aware of Sgt. Bowers' abuse of Plaintiff and also failed to report same to his superiors or other supervisory personnel as required by law. After this incident but during the period of time in which the incidents set forth below occurred, Sgt. DiPaolo made several comments to Plaintiff indicating that he knew about the sexual abuse. At one point, Sgt. DiPaolo told Plaintiff that he knew about "the nasty stuff going on with Bowers." Another time he told Plaintiff, "We all know about it."

78.     Thereafter, Sgt. Bowers came to Plaintiff's cell and told her to remove her clothes. Other officers walking by saw what was going on so Bowers took Plaintiff to another area. There, Sgt. Bowers ordered Plaintiff to remove her clothes and masturbate herself, which she did. While she was doing so, Bowers rubbed Plaintiff's breasts and inserted his finger into her anus. Bowers also ordered Plaintiff to masturbate him, which she did.

79.     On another occasion, Sgt. Bowers took Plaintiff to the B1 staircase, where he told Plaintiff to perform oral sex on him and insert her fingers into her anus. Afterward, at approximately 10:00 p.m., while Plaintiff and Sgt. Bowers were still in the stairwell (at a place and time no prisoner was permitted to be), other officers walked by and watched as they spoke.

80.     On another occasion, Sgt. Bowers had anal sex with Plaintiff.

81.     At the times and places Sgt. Bowers sexually abused Plaintiff, he was in areas he was not assigned to be in. Officers and supervisors were aware that Sgt. Bowers was where he was not supposed to be, doing acts he was not supposed to be doing, yet failed to report him or intervene on behalf of Plaintiff. Upon information and belief, Sgt. Bowers had a female family member (believed to be a cousin) employed at Woodbourne CF. On one occasion, she was heard saying Bowers is "never where he's supposed to be."

82.     Upon information and belief, Sgt. Bowers was sexually abusing and harassing other prisoners prior to and concurrent with Plaintiff.

83.     In or about March 2016, a prisoner caught Sgt. Bowers sexually abusing Plaintiff and reported it to the PREA department. This prompted an investigation that is, upon information and belief, still ongoing.

84.     In retaliation for a prisoner reporting Plaintiff's abuse to the PREA department, John Doe officers began issuing more illegitimate misbehavior reports to Plaintiff.

85.     Sgt. Bowers' brazen and abusive behavior was allowed to occur and continue by virtue of the gross negligence in which he and the subject housing area were supervised. By making predictable rounds, failing to ensure secured areas were actually secured, and otherwise failing to supervise their subordinates as set forth herein, in violation of their supervisory responsibilities, defendants Lilley, Humphrey, and "John Doe" sergeants, captains, watch commanders, and deputies were grossly negligent in the instance. Likewise, these defendants were aware of the serious risk of sexual assault that Plaintiff faced and failed to remediate that risk. These defendants did not address Plaintiff's safety nor properly assess the danger she was

in. These defendants knew that the housing area was understaffed, unmonitored, and isolated because they conducted rounds of the area, read the area logbooks, and made visual inspections. It is reasonable to believe or infer that these defendants knew about Bowers' ongoing sexual abuse and harassment of Plaintiff. These defendants also created policies, customs and practices that allowed the unconstitutional acts to occur, including but not limited to the routine lack of adequate supervision in the areas where Plaintiff was sexually harassed and abused, the handling of day-to-day security that allowed Bowers to be alone with Plaintiff for extended period of time, and in making routine rounds that allowed Bowers to know when it was safe for them to abuse Plaintiff.

86.     As a result of the incidents aforesaid, Plaintiff suffered and continues to suffer physical, psychological and emotional injuries, pain and suffering, shame, humiliation, and anxiety.

87.     Upon information and belief, after the defendant supervisory officials and prison staff became aware of the incidents aforesaid, Plaintiff was not classified as a "protective custody" prisoner nor was she offered a transfer to a housing area where she and officers would be under greater observation.

88.     Upon information and belief, the defendant supervisory officials and prison staff had notice that defendants Rowe, Latham and Bowers were physically and sexually abusive to prisoners, Plaintiff included, as defendants Lockhart, DiPaolo and John Does personally witnessed the unlawful acts and were under a legal duty to report same to supervisors and other prisoners reported these defendants' abuses prior to and concurrent with the time period Plaintiff was being abused.

89.     The defendant supervisory officials and prison staff at Greene CF and Woodbourne CF had notice that Plaintiff was highly susceptible to sexual victimization as she is a transgender female housed in a male prison.

90.     The defendant supervisory officials and prison staff at Greene CF and Woodbourne CF had notice that Plaintiff was highly susceptible to sexual victimization due to her reporting *inter alia* that she was sexually abused by a chaplain at Rikers Island.

91.     The defendant supervisory officials and prison staff at Woodbourne CF had notice that Plaintiff was highly susceptible to sexual victimization due to the reported incidents that occurred at Greene CF.

92.     Defendants acted with deliberate indifference to the safety of A.K. by *inter alia* allowing sexual predators to be and remain on staff, by allowing sexual predators to supervise transgender females, by allowing sexual predators to take Plaintiff to unmonitored areas where they were free to abuse her, by failing to install surveillance cameras in areas where abuses of all kinds are known to frequently occur, by failing to train staff to recognize the signs of coercion and sexual abuse, by failing to train staff to recognize and report patterns of certain officers that are engaging in physically and sexually abusive tactics, by failing to recognize and appreciate the specific risks that transgender females and sexual abuse victims face in prison and to implement policies and practices to improve their safety, and by failing to identify a systemic problem of transgender females being sexually victimized by staff.

93.     In addition to the specific risks involving Plaintiff and the unmonitored areas where she was raped, assaulted and abused, the defendant supervisory officials and prison staff knew of the heightened safety risks surrounding transgender prisoners generally. In 2003,

Congress passed the Prison Rape Elimination Act ("PREA") in response to the documented pervasiveness of sexual violence in confinement settings. The statute required the Department of Justice ("DOJ") to issue binding national standards to assist in the prevention and response to sexual violence. *See* Prison Rape Elimination Act of 2003, codified at 42 U.S.C. §15601, *et seq.*

94.     Following PREA's passage in 2003, the Prison Rape Elimination Commission ("the Commission") was formed to research the changes needed to ensure the safety of all prisoners from sexual violence. The PREA Commission issued its final report in June 2009. The Report found that male-to-female transgender individuals are at a <u>heightened</u> risk of experiencing sexual assault in prisons. Furthermore, the Report recommended that corrections administrators improve their capacity to identify vulnerable populations and protect them accordingly. All related findings noted the vulnerabilities of particular groups in confinement, including additional safety precautions for lesbian, gay, bisexual, and transgender (LGBT) prisoners, due to the high incidences of sexual assault they experience. Specifically, the 2009 PREA Commission Report states that "research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with non-heterosexual orientations and transgender individuals."

95.     Defendants have long been aware of the heightened risks transgender prisoners face in men's correctional facilities. Twenty years before the incidents alleged herein, when faced with a similar case involving the rape of a transgender prisoner by another prisoner, the Supreme Court of the United States recognized the obvious danger that transgender prisoners face. In *Farmer v. Brennan,* 511 U.S. 825 (1994), the Court found that prisons have a duty to protect prisoners from violence at the hands of other inmates. It also held that prison officials

violate prisoners' constitutional guarantee of basic safety when they know of a significant risk of harm and fail to take reasonable measures to protect them. Id. at 842. This clearly established law placed defendants on notice of their basic duties under the Constitution. The defendants' failure to act in light of their knowledge of the law and the risk to Plaintiff's safety demonstrates deliberate indifference under the Eighth Amendment.

96.     Before the rapes and abuses alleged herein, it was widely known and discussed both inside and outside the correctional community that LGBT and gender nonconforming prisoners were among the groups with the highest rates of sexual victimization in prisons and jails. For example, the Bureau of Justice Statistics ("BJS"), the Department of Justice, and the National Institute of Corrections have both noted publicly that LGBT prisoners are particularly vulnerable to sexual abuse while incarcerated. See, BJS, *Sexual Victimization in Prisons and Jails Reported by Inmates 2011-12, National Inmate Survey* (2013); NICIC, *Lesbian, Gay, Bisexual, Transgender and Intersex Offenders* (available at http://nicic.gov/lgbti).

97.     Information detailing DOCCS's lack of sufficient procedure and training for the safety of transgender prisoners has been publicized in recent years. In 2007, the Sylvia Rivera Law Project published a report that unveiled the violence and discrimination transgender prisoners face in New York State prisons. See, Sylvia Rivera Law Project, *"It's a War In Here": A Report On The Treatment Of Transgender And Intersex People (New York State Men's Prisons)* (2007). The report included narratives from transgender prisoners discussing the physical and sexual abuse they endured at the hands of other prisoners, correctional officers, and other prison staff. The defendant supervisory officials are on notice of these reported incidents and findings as not only most of them were reported to DOCCS and/or investigated by the

Inspector General's Office, but upon information and belief, the Sylvia Rivera Law Project presented this report to various DOCCS officials, including the Commissioner and defendant superintendents. Moreover, the report was posted on the National Institute of Corrections' webpage.

98.     According to an August 7, 2014 article published by Solitary Watch, "…no data exists tracking transgender experiences of assault [in] New York prisons, [however]…data from other studies[] suggests that it is an commonplace ordeal for transwomen locked up. In a 2007 study [by UC Irvine Center for Evidence-Based Corrections] of California prisons, for example, 59% of transwomen polled reported experiencing sexual assault while on the inside – a rate nearly 13 times higher than average amongst the state's prison population. According to recent Bureau of Justice Statistics data, nearly half of the alleged instances of sexual violence in prisons and jails across America are actually committed by facility staff."

99.     Despite actual knowledge that sexual violence was likely to occur, Defendants acted with deliberate indifference to Plaintiff's basic safety. This is further exemplified by the fact that DOCCS' Annual Report on Sexual Victimization (2013-2014) does not make a single mention of LGBT prisoners let alone a distinction between their rate of victimization by staff and inmates compared to other prisoners.

100.     In a report submitted to DOCCS by the Correctional Association of New York ("CA"), entitled *Greene Correctional Facility: 2012-2014*, CA stated that

> During our visit and in survey responses in November 2012, and from additional correspondence and in-person interviews in 2014, people incarcerated at Greene reported some of the worst levels of alleged physical abuse by staff, and in turn fear and intimidation, of all CA-visited prisons. In addition, people incarcerated at Greene reported racial and verbal harassment, aggressive pat frisks, and retaliation for raising

complaints. Particularly disturbing were reports that such abuse was most targeted at young people at the facility. As one survey respondent summarized the situation at Greene:

> [People incarcerated] here at Greene get violated and mistreated by COs every day. The most things that usually occur are: staff misconduct, physical abuse, harassment, abusive-sexual pat frisks, being set-up with narcotics or weapons, retaliation for people putting in grievances. They use a lot of scare tactics and physical force to get what they want, because most of the jail are adolescents that don't know no better or what to do.

See, *Greene Correctional Facility: 2012-2014*, p. 5 (emphasis in original)

101.    CA's report strikingly documents that "Although it is a medium security prison, the reported levels of abuse and intimidation by staff ranked Greene among the worst of maximum security prisons as well, rivalling [sic] notorious prisons like Attica." Id. With regard to sexual abuse, CA's survey of prisoners found that in 2012, 22.4% of prisoners reported that sexual abuse is either "common" or "most common" with staff, making Greene CF 33rd of the 41 facilities visited by CA.[10]

102.    At the conclusion of its investigation, CA's recommendations to DOCCS and prison officials included, *inter alia*:

- Immediately stop all staff excessive use of force, particularly against young people
- Implement a no tolerance policy for abuse, and remove abusive officers.
- Remove all 16- and 17-year-olds from Greene and from all adult jails and prisons, moving them into youth justice facilities where their unique developmental needs can better be met.
- Fundamentally transform the culture of Greene to provide a supportive, developmentally appropriate environment for all people, and particularly young people into their mid-20s.

See, *Greene Correctional Facility: 2012-2014*, p. 3.

---

[10] CA ranks facilities they visit from best to worst with one as the best and 41 the worst.

103.    CA's findings are consistent with a 2014 New York State Inspector General's investigation into Greene CF staff assaults on prisoners following the beating of Matthew Thornton by another prisoner. As reported by the New York Times, "[t]he inquiry concluded that it was in fact instigated by correction officers to punish Mr. Thornton, apparently because he had complained about prison staff members and would talk to senior prison officials during their rounds…The investigation also found that the officers stood by during the attack – one even watched from outside the cell – and then engineered an elaborate cover-up, the records show." See, *New York Prison Guards Instigated Attack on Inmate and Engineered Cover-Up*, New York Times, January 7, 2016.

104.    Since Jack Beck, Director of CA's Prison Visiting Project, testified before the DOJ and the Review Panel on Prison Rape in April 2011, the defendant supervisory officials and prison superintendents have, upon information and belief, failed to implement any of his recommendations.[11] In his testimony three years before the subject incidents, Mr. Beck affirmatively informed state officials that "[t]he data we have analyzed and the information we obtained during CA prison visits supports the conclusion that staff sexual abuse is a problem within New York prisons…We also found the reporting of New York state prison sexual abuse data by DOCS to be confusing and at times inconsistent. Finally, and most disturbing, we believe there is significant under-reporting of sexual abuse by inmates and by DOCS, and grossly inadequate substantiation of inmates' complaints of sexual abuse by prison officials."

105.    Mr. Beck also stated that "[a]busive pat frisks are a common complaint of inmates

---

[11] Mr. Beck recommended taking a "strong stance on addressing both abusive pat frisks and other sexually abusive behavior" and installing video cameras "at locations where inmates are searched or are with staff away from their housing or program areas."

throughout DOCS facilities, and these complaints can overlap with the issue of staff sexual abuse. We believe sexually abusive pat frisks are a problem that should be addressed by the PREA standards, and we do not accept the assertion that because staff have a right to touch an inmate's buttocks and groin area, such conduct should justify unnecessarily aggressive or probing actions to the extent that inmates perceive the search to be sexually offensive."

106.    Mr. Beck also reported that "[t]he New York prison system does not have an aggressive program to identify vulnerable individuals," finding that the protective custody population is "significantly below 1,000 beds across the state, representing less than 2% of prison capacity," and that sexual abuse is under-reported by prisoners due to intimidation and fear of retaliation and targeting by staff for making such allegations.

107.    Furthermore, based upon DOCCS' annual reports by facility for 2008 through 2010 provided to, reviewed and analyzed by CA, a prisoner is *five times more likely* to be sexually abused by staff than another inmate.[12] Moreover, the BJS Victimization Report 2007-2008, reveals that for all New York prisons during that period only 29 cases from a total of 475 allegations of staff sexual abuse were substantiated, representing only 6% of all complaints. As Mr. Beck testified, "[i]n contrast to this paltry success rate, inmate complainants about staff sexual abuse face very real threats of isolation, retaliation and further abuse by the correction staff if they come forward to accuse of the prison staff of sexual violence." Compared with the 95% rate by which New York inmates charged with violating prison rules are found guilty (where inmate testimony is almost never accepted when contradicted by staff testimony), "[i]t is

---

[12] "For staff sexual abuse, the annual numbers of the whole Department were 574, 566 and 583 incidents for 2008, 2009 and 2010, respectively. Allegations of inmate sexual abuse were reported as 116, 110 and 102 claims for 2008 through 2010, respectively."

difficult to justify undertaking these risks given such limited possibilities of success. The consequence of imposing such barriers to getting meaningful relief for sexual abuse is that many inmates will decide to endure the abuse and hope that they will leave the prison or be transferred away from the harmful situation."

108.   In addition to the foregoing, the defendant supervisory officials maintained a policy and practice of failing to faithfully investigate prisoner complaints of sexual abuse and harassment by staff and inmates, which leads officers to believe that they can sexually abuse prisoners with impunity and/or fail to report other officers' suspected or witnessed abuse of prisoners and no adverse consequences will come to them. This practice and policy starts at the Commissioner level and permeates throughout all DOCCS facilities. For example, on May 5, 2014, a transgender prisoner at Upstate Correctional Facility filed a grievance alleging that a staff member was sexually harassing her by grabbing her crotch. In denying the grievance, the superintendent stated "The staff member identified in the complaint submitted written a statement [sic] denying the allegations of sexually harassing the grievant...Upon review of the information submitted, no misconduct by staff was found and no further action will be taken at this time. Grievance denied." For another example, in late 2014, two transgender prisoners at Clinton Correctional Facility reported separate incidents of being sexually abused by another prisoner (forced to perform oral sex with a sharp object at their throats). Both incidents were investigated by DOCCS. Both inmates preserved sperm from their abusers for DNA testing. Housing unit officers were questioned by investigators for both incidents and claimed there was no way it could have happened as they were on post when and where they were supposed to be. Both abusers first denied the oral sex and later admitted it when informed that the victim had

kept their sperm for DNA testing. Both incidents were closed shortly thereafter as "unsubstantiated," without any disciplinary action taken against the offending prisoners or the officers and supervisors responsible for guarding the areas.

109.    As same relates to the plaintiff, only C.O. Rowe was thoroughly investigated in this matter and only because A.K. was able to preserve his sperm as evidence. Yet, none of the sergeants, captains, watch commanders, or deputies charged with making rounds, supervising Rowe, and ensuring the safety and security of the housing area were ever questioned as part of the investigation nor were any of them disciplined for Rowe being able to abuse Plaintiff for so long right in front of their disinterested faces. Likewise, neither C.O. Latham, Sgt. Bowers, or any of the sergeants, captains, watch commanders, or deputies charged with making rounds, supervising Latham and Bowers, and ensuring the safety and security of the housing area were ever questioned as part of that investigation nor were any of them disciplined for Latham and Bowers being able to abuse Plaintiff for so long right in front of their disinterested faces.

110.    The defendant supervisory officials had an unlawful municipal policy of ratification of the unconstitutional conduct alleged herein. Their failure to take reasonable measures to curb this unconstitutional conduct (through discipline, training, more or better supervision, and/or termination) led to the violations and abuses of Plaintiff as alleged herein.

111.    The defendant supervisory officials allowed a culture of degrading, humiliating, harassing and abusive treatment towards transgender prisoners that fostered the belief amongst their subordinates that they could act with impunity against these prisoners. This is supported by the findings set forth in DOCCS' Annual Reports on Sexual Victimization for 2013-14 and 2015. Therein, it was reported that allegations of staff sexual misconduct rose from 176 in 2013 to 228

in 2014 to 258 in 2015; allegations of staff sexual harassment rose from 101 in 2013 to 166 in 2014 to 189 in 2015. These figures are nearly triple the number of allegations of inmate-on-inmate nonconsensual acts, abusive sexual contacts, and sexual harassment combined during that same period of time. Compare, 73 total in 2013, 94 in 2014, and 106 in 2015. Clearly, the training and reporting programs put in place by the defendant supervisory officials was inadequate and not working as rates of staff-on-inmate and inmate-on-inmate incidence should be declining not steadily rising.

112.   Defendants' investigation practices are also inadequate and not working. According to DOCCS' 2015 Annual Report on Sexual Victimization, of the 350 allegations of sexual abuse and harassment reported to DOCCS in 2013, 12 incidents (3.4%) were substantiated and 18 (5.1%) were unfounded. In 2014, of the 488 allegations, 21 incidents (4.3%) were substantiated and 79 (16.2%) were unfounded. In 2015, of the 553 allegations, 13 incidents (2.4%) were substantiated and 85 (15.4%) were unfounded. That leaves 320 incidents in 2013, 388 incidents in 2014, and 455 incidents in 2015 that were "unsubstantiated," meaning that the "investigation produced insufficient evidence to make a final determination as to whether or not the event occurred." Given the examples from Clinton CF aforesaid, DOCCS' failure to substantiate this amount of claims seems dubious. Presumably, this is due to DOCCS' burden of proof being "a preponderance of the evidence." By contrast, DOCCS' burden of proof at a Tier III hearing is "substantial evidence" -- "Such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact." An officer's misbehavior report submitted at a Tier III hearing is routinely held to constitute "substantial evidence," yet DNA evidence that a nonconsensual sexual act occurred between inmates has been found, at least twice, to not be

adequate to conclude the incident occurred based on "a preponderance of the evidence."

## FIRST CLAIM FOR RELIEF:
## 42 U.S.C. §1983
## DEPRIVATION OF FEDERAL CIVIL RIGHTS AGAINST
## DEFENDANTS ROWE, LATHAM, BOWERS,
## LOCKHART, DIPAOLO, AND JOHN DOES

_____

113.    Plaintiff repeats, reiterates and realleges each and every allegation of paragraphs "1" through "112", inclusive, of this Complaint, as if same were fully set forth herein.

114.    As set forth above, defendants Rowe and Bowers sexually abused, assaulted and raped the plaintiff.

115.    As set forth above, defendants Rowe, Latham and Bowers forcibly touched and suggestively pat frisked Plaintiff for their own sexual gratification.

116.    As set forth above, defendants Latham, Bowers, and John Does retaliated against Plaintiff for reporting the abuses.

117.    Defendants Lockhart, DiPaolo, and John Does facilitated these rapes and other sexual abuses by failing to intervene of Plaintiff's behalf, by failing to protect Plaintiff, by making predictable rounds, by failing to ensure that prisoners and staff are where they are supposed to be, by failing install surveillance cameras, by failing to enforce anti-fraternization rules, by failing to report what they saw, suspected or heard, by failing to faithfully investigate prisoner grievances and complaints of sexual victimization by staff, by failing to report suspicious interaction and/or conduct between a staff member and a prisoner, and by otherwise failing to meaningfully screen, train and supervise correction officers assigned to their respective prison.

118.    As set forth above, defendants Rowe, Latham, Bowers, Lockhart, DiPaolo, and John Does, acting under color of state law, deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. §1983.

119.    As a result of the foregoing, Plaintiff suffered and continues to suffer severe and permanent physical, psychological and emotional injuries, pain and suffering.

**SECOND CLAIM FOR RELIEF:**
**42 U.S.C. §1983**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS AGAINST**
**DEFENDANTS ANNUCCI, SMITH, LILLEY, HUMPHREY, MCGUINNESS**
**AND JOHN DOES**

120.    Plaintiff repeats, reiterates and realleges each and every allegation of paragraphs "1" through "119", inclusive, of this Complaint, as if same were fully set forth herein.

121.    As set forth above, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does, acting under color of state law, deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. §1983.

122.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does facilitated these rapes and other sexual abuses by failing to implement policies consistent with the Prison Rape Elimination Act, by failing to screen employees through background checks and other methods, by permitting its supervisory officials and staff to operate in the manner alleged herein, by failing to monitor (through cameras or otherwise) known at-risk areas, by failing to implement meaningful consequences for officers and clinic staff who fail to report suspected

and/or witnessed rape and sexual abuse, by failing to encourage victims to report rape and sexual abuse, by failing to post signs throughout each prison stating it is a felony for an officer or clinic staff member to have sexual intercourse or contact with a prisoner, by failing to take reasonable measures to ensure the safety and security of prisoners who are at heightened safety risk (such as transgender females in a men's prison), by failing to implement adequate and effective training, supervision and monitoring policies, by failing to implement security policies that do not force at-risk prisoners to choose between being safe and being in keep-lock, and in being otherwise deliberately indifferent to the heightened safety risks Plaintiff faced as a transgender female in a men's prison.

123.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does know that certain officers visit prisoners in their cells after hours for the illicit purposes alleged herein and then have sexual interaction with such prisoners either in their cell or would escort the prisoner to one of the many unmonitored areas in the prison (e.g., stairwells, vestibules, showers, staff rooms, etc.). These defendants know the unmonitored areas where these abuses take place yet they consciously disregard the known risk they pose to prisoners' safety. Furthermore, Defendants were no doubt aware of the Prison Rape Elimination Act, which was passed in 2003 in part to protect transgender prisoners from well-documented and pervasive sexual violence in confinement facilities. the defendant supervisory officials at DOCCS, as well as Greene CF and Woodbourne CF officials, failed to protect Plaintiff from these vicious abuses and were deliberately indifferent to Plaintiff's vulnerable situation.

124. Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does remained indifferent to the culture of rape and sexual abuse in their prisons even after Plaintiff

and other prisoners reported that they had been raped and sexually abused or had witnessed same. Although DOCCS' Office of Special Investigation did investigate Plaintiff's claims against defendant Rowe, it has failed to take prompt action to investigate, prosecute and punish other officers who are believed to have been aware of and/or witness to these incidents but failed to report same. With regard to Plaintiff's claims against defendants Bowers and Latham, Defendants have failed to investigate, prosecute or punish either of these individuals or witnesses thereto. Defendants have also failed to take any action to mitigate or remediate the risks of sexual victimization to transgender prisoners.

125.   Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' unreasonable practices described above were in disregard for Plaintiff's obvious and substantial risk of harm as a transgender prisoner, amounting to deliberate indifference to her safety.

126.   Despite defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' notice that Plaintiff, as a transgender woman, was highly vulnerable to sexual violence, she was repeatedly placed in situations of imminent peril and was repeatedly abused by the defendant officers, in violation of her right to be free from cruel and unusual punishment.

127.   As set forth above, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does facilitated the rape and sexual abuse suffered by Plaintiff.

128.   By their policies, practices, acts, and omissions, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does caused Plaintiff to be subjected to forcible touching, sexual assault, rape and otherwise sexually victimized.

129.   Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' failure to institute adequate safeguards in their hiring, screening, training and supervision

practices demonstrates their deliberate indifference to the safety and well-being of inmates in their custody, care and control.

130.    The defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does were grossly negligent in failing to (a) conduct background checks of staff conditionally hired by DOCCS, (b) conduct fingerprint checks of staff conditionally hired by DOCCS, (c) oversee DOCCS' hiring of staff, and (d) continue to monitor the activities of their officers after hire.

131.    The defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does were grossly negligent in failing to supervise to ensure, among other things, that (a) the officers hired were properly vetted, (b) officers were properly supervised and their performance was regularly reviewed, and (c) the areas where the abuses alleged herein occurred were safe and secure.

132.    The defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does were grossly negligent in failing to adopt policies, practices and procedures and/or enforce those already in place that (a) require DOCCS and each facility to follow strict professional and character standards when assessing and vetting applicants for employment in DOCCS facilities, (b) require DOCCS and each facility to conduct follow-up background investigations into disclosures that call an applicant's judgment and character into question, (c) require DOCCS and facilities to screen applicants specifically for vulnerability to corruption, contraband smuggling, and committing sexual abuse, (d) require DOCCS and facilities to compel candidates to disclose and describe the circumstances of all prior convictions and arrests and prior employment disciplinary history, (e) set training and re-training requirements for all staff working in DOCCS facilities, (f) set performance requirements for all staff working in DOCCS facilities, and (g)

require DOCCS and each facility to perform periodic post-employment checks to ensure employees are not fraternizing with prisoners.

133.   Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does were grossly negligent in that they (a) hired the defendant officers who were not properly vetted, (b) failed to supervise and review the defendant officers' performance, (c) failed to ensure that the defendant officers were not smuggling contraband into the prison for inmates, (d) failed to conduct adequate background checks on the defendant officers resulting in employment of these individuals with obvious propensities to commit criminal behavior, (e) failed to follow strict professional and character standards when assessing the defendant officers DOCCS facilities, (f) failed to conduct follow-up background investigations into disclosures that call the defendant officers' judgment and character into question, (g) failed to screen the defendant officers specifically for vulnerability to corruption and committing sexual abuse, (h) had an otherwise substantially flawed and deficient application, interview and screening process of candidates, and (i) failed to adopt policies, practices and procedures and/or enforce those already in place regarding the foregoing.

134.   Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does know that certain correction officers create feigned situations in order to avail themselves of more frequent, largely unrestricted, and lengthier private interaction with inmates than other DOCCS staff. These defendants are also aware, based upon prior allegations and investigations, that these officers have ample opportunities to engage in misconduct with inmates. Yet, despite the foregoing, these defendants fail to take any curative or disciplinary action against the officers or any affirmative action to protect the involved inmates.

135.    Due to prior allegations and investigations, Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does knew that officers subject transgender female prisoners (victims of prior sexual assault in particular) to recurrent and ongoing acts of rape and other sexual abuse, including forced sexual intercourse, oral sexual acts, sexual touching, coercive and suggestive pat frisks, demeaning sexual comments, and physical and verbal intimidation to deter inmates in custody from reporting such sexual abuse, but have failed to take reasonable measures to prevent or curb this pattern of abuse.

136.    Due to prior allegations and investigations, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does knew that officers who rape and sexually abuse inmates routinely leave their assigned posts, allow the abused inmates into areas where they are not permitted, congregate in areas that are known to be outside the view of monitored security cameras, and engage in open and public behavior that is obviously suggestive of inappropriate personal relationships and sexual abuse of inmates. The abusing officers often provide their victims with contraband items. These behaviors are known and visible to other officers, supervisory personnel, the defendant supervisory officials, and prisoners alike. Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does failed to take action despite knowledge of these activities and have not enforced policies intended to identify, address, and prohibit sexual abuse of inmates by staff.

137.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does permit officers virtually unfettered access to inmates and unmonitored areas where they can rape and sexually abuse inmates with minimal risk of detection.

138.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does failed

to ensure that security cameras are installed in these high risk areas and, where cameras are installed, have failed to ensure that they are functional.

139.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does have failed to employ obvious measures to reduce the risk of rape and sexual abuse of inmates, such as heightened monitoring of behavior indicative of ongoing sexual abuse, appropriately placed and functional surveillance cameras installed and maintained without staff knowledge, exit interviews of incarcerated inmates upon transfer or release, random interviews of staff, and more frequent, unannounced rounds by supervisory officials.

140.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' system for the reporting and investigation of rape and sexual abuse is grossly inadequate. It relies almost entirely on inmates reporting their own rape and sexual abuse and then fails to take appropriate action to protect those who do come forward or to punish their abusers.

141.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does have failed to train correction officers, mental health staff, and clinic staff to notice the signs of sexual victimization, to take reports of rape and sexual abuse seriously, and to give adequate weight to the credibility of inmate witnesses.

142.    Pursuant to custom and practice, inmates who report rape and sexual abuse are not protected from retaliation by fellow officers.

143.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does do not consistently investigate reports of rape or sexual abuse in a prompt or thorough manner, if at all. Once an inmate reports that he or she has been raped or otherwise sexually abused, weeks can pass before an investigation begins. Regardless of what an investigation reveals, the subjects

are rarely disciplined, and inmates are rarely informed of the outcome.

144.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does treat inmates as adversaries rather than allies. In the case of Plaintiff, for example, her claims against Sgt. Bowers were treated dismissively by investigators, despite her prior allegations against C.O. Rowe being supported by DNA evidence.

145.    Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' long-standing failure and/or refusal to supervise and train the corrections officers under their control, including supervisory staff, is now so institutionalized as to constitute a policy or custom of tolerating and authorizing the type of abuse alleged herein. It is this policy or custom of abuse and cover-up that has caused or contributed to the deprivation of the plaintiff's rights.

146.    Said policy or custom is further evidenced by frequent and significant findings of officer misconduct over a period of years by defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does.

147.    The failures and refusals by defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does to hold their officers accountable is a proximate cause of the injuries and abuses sustained by the plaintiff, and undoubtedly dozens of other transgender women.

148.    Through promotions and other financial and status incentives, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does have the power to reward officers who perform their jobs adequately, including reporting abusive officers, and to punish – or at the very least fail to reward – those who do not. Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does' actions and omissions have created and maintained the perception that supervisors, officers and clinic staff who turns a blind eye towards evidence of

sexual harassment, intimidation, abuse and rape, contraband smuggling by staff for inmates, and fail to report or investigate these incidents, will suffer no damage to his or her career or financial penalty.

149.    The pattern of unchecked sexual abuse against transgender prisoners, and the persistent failure or refusal of Defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does to adequately supervise these persons and to take action to curb the misconduct, demonstrates a policy of deliberate indifference which tacitly authorized the abuses claimed by the plaintiff.

150.    The foregoing customs, policies, usages, practices, procedures and rules of defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does are maintained with deliberate indifference to the safety, well-being and constitutional rights of the plaintiff and were the direct and proximate cause of the constitutional violations suffered by the plaintiff as alleged herein.

151.    The foregoing customs, policies, usages, practices, procedures and rules of defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does were the moving force behind the constitutional violations suffered by the plaintiff as alleged herein.

152.    As set forth above, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does failed to protect Plaintiff from known and foreseeable harm.

153.    As set forth above, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does failed to intervene, mitigate and/or stop the abuses alleged herein.

154.    As set forth above, defendants Annucci, Smith, Lilley, Humphrey, McGuinness and John Does knew of and consciously disregarded an excessive risk to Plaintiff's health and

safety.

155.    As a result of the foregoing, Plaintiff suffered and continues to suffer severe and permanent physical, psychological and emotional injuries, pain and suffering.


## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues in this matter.

## RELIEF

Plaintiff requests the following relief, jointly and severally, against all of the defendants:

1.    An award of compensatory damages against all defendants in an amount to be determined at trial;

2.    An award of punitive damages against all defendants in an amount to be determined at trial;

3.    An award of attorney's fees, expert's fees, costs and disbursements; and

4.    Such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
        September 20, 2017

                                    Yours, etc.,

                                    **HELD & HINES, L.L.P.**
                                    *Attorneys for Plaintiff*
                                    2004 Ralph Avenue
                                    Brooklyn, New York 11234
                                    (718) 531-9700
                                    phines@heldhines.com

                                    By: _____/s/_____
                                            Philip M. Hines, Esq.

## **ATTORNEY VERIFICATION**

PHILIP M. HINES, an attorney duly licensed to practice in the courts of the State of New York, hereby affirms the following under penalties of perjury:

That I am a member of the law firm of HELD & HINES, L.L.P., attorneys for the plaintiff in the within action; that I have read the foregoing AMENDED COMPLAINT and know the contents thereof; and that the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe them to be true. The reason this Verification is made by me and not by the plaintiff is that the plaintiff resides outside of the County in which the Affirmant's office is located.

The grounds of my belief as to all matters stated upon my own knowledge are as follows: the records, reports, contracts, and documents contained in the plaintiff's file.

_____/s/_____
PHILIP M. HINES, ESQ.

Affirmed to this 20th
day of September, 2017
